UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

          v.                              Civil No. 10-cv-39-JL
                                          Opinion No. 2013 DNH 045
Alex D. Washington *et al.*


**MEMORANDUM ORDER**

    This is an action by the government to enforce its tax liens
against proceeds from the sale of a parcel of residential real
estate previously owned by defendants Alex D. and Sharon N.
Washington.  See 26 U.S.C. § 7403.  In addition to the
Washingtons, the government has joined as parties a number of
entities which claimed an interest in the property, see id.
§ 7403(a), including defendants Bank of America and Bank of New
York, Mellon Trust Company, N.A. (the "Banks").[1]  This court has
subject-matter jurisdiction under 26 U.S.C. § 7403(a) (civil
actions to enforce federal tax liens).

    The government has moved for partial summary judgment, see
Fed. R. Civ. P. 56, arguing that there is no genuine issue of

_____

    [1]Bank of America claims that it services the Washingtons'
mortgage loan on behalf of Bank of New York--and also claims that
it, rather than Bank of New York, was the holder of the
promissory note the Washingtons gave when they took out their
mortgage loan.  Accordingly, Bank of New York's claimed interest
in the Washingtons' property is unclear.  Because it makes no
difference to the analysis, however, the court has simply treated
both of these banks as a single entity.

material fact as to whether the Banks even held any enforceable interest in the property at the time it was sold, so that they are not entitled to any of the proceeds from its sale. Specifically, the government argues, there is no evidence that the Banks have the right to enforce the mortgage on the property, or the accompanying promissory note, that the Washingtons gave when they purchased the property in 1987. To the contrary, the government says, the undisputed record evidence shows that, in 1993, the note and mortgage were assigned to defendant American Strategic Income Portfolio, Inc.-III ("ASIP"), which has not since subsequently assigned the note to anyone else.

The Banks claim their interest in the property through another entity, First National Bank of Chicago. But by the time First National obtained its assignment of the note, from the receiver of Home Owners Federal Savings and Loan Association, Home Owners had already assigned the note to another party, Knutson Mortgage Corporation, which subsequently assigned the note to ASIP. It follows that, at the time the Home Owners receiver purported to assign the note to First National, Home Owners no longer had any interest in the note to assign--and that First National, in turn, had no interest to assign to the Banks.

In opposing the government's motion for summary judgment, the Banks do not dispute that the assignment to First National

2

post-dated the assignment to ASIP, nor do they question the
black-letter law that, as a result of this chronology, First
National would have no interest in the note to assign.  Instead,
the Banks argue principally that, when Knutson obtained its
assignment of the note, it obtained only "limited powers and
rights . . . .  Presumably, pursuant to a servicing agreement
between Home Owners and Knutson, these powers and rights did not
include the power of assignment."  That power, the Banks suggest,
remained with Home Owners, and was subsequently exercised by its
receiver to make a valid assignment of the note and mortgage to
First National.  The Banks, however, have not come forward with
any evidence of such a servicing agreement or, indeed, anything
but speculation to support their theory that Home Owners retained
an interest in the note or mortgage notwithstanding the
assignment to Knutson.  After hearing oral argument, then, the
court grants the government's motion for summary judgment, for
the reasons explained in full below.

## I.   <u>Applicable legal standard</u>

Summary judgment is appropriate where "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  A dispute is "genuine" if it could reasonably be
resolved in either party's favor at trial, and "material" if it

could sway the outcome under applicable law.  See Estrada v.
Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  In analyzing a
summary judgment motion, the court "views all facts and draws all
reasonable inferences in the light most favorable to the
non-moving" parties.  Id.

 Nevertheless, and of particular relevance here,
"[u]nsupported allegations and speculation do not demonstrate
. . . a genuine issue of material fact sufficient to defeat
summary judgment."  Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st
Cir. 2011).  Instead, "[t]o defeat a motion for summary judgment,
the nonmoving party must 'set forth specific facts showing that
there is a genuine issue for trial.'"  Welch v. Ciampa, 542 F.3d
927, 935 (1st Cir. 2008) (quoting Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 256 (1986)).

**II.  Background**

**A.  Execution and assignments of the note and mortgage**

 In 1987, the Washingtons purchased a parcel of land in
Londonderry, New Hampshire, now known and numbered as 6 Autumn
Lane.  They financed the purchase with a loan from Camelot
Financial Services.  In exchange for the loan, the Washingtons
gave Camelot a promissory note in the amount of $177,000, dated
September 30, 1987.  To secure the debt, they simultaneously gave

4

Camelot a mortgage on the Autumn Lane property.  The mortgage was promptly recorded in the Rockingham County Registry of Deeds.

Camelot immediately assigned the note and the mortgage to Home Owners.  The assignment of the note was accomplished by indorsing it, on behalf of Camelot, "without recourse, pay to the order of Home Owners Federal Savings and Loan Association."  The assignment of the mortgage was accomplished through an instrument entitled "Assignment of Mortgage," also signed on behalf of Camelot.  This instrument was promptly recorded in the Rockingham County Registry of Deeds.

Later, on October 27, 1987, Home Owners assigned the note to Knutson.  This was accomplished by indorsing it, on behalf of Home Owners, "pay to the order of Knutson Mortgage Corporation without recourse."  The government and the Banks agree that, at the time of this assignment, Knutson was a subsidiary of Home Owners.  The only record evidence of this fact, though, consists of two news articles submitted by the government.  See Ingrid Sundstrom, Boston firm wants to sell Knutson Mortgage Co., Minneapolis-St. Paul Star Tribune, Feb. 23, 1990, at 3D;  Karen Cord Taylor, Being bigger is no small matter:  Massachusetts' largest S&L relies on its size and rigorous management, Am. Banker, Oct. 26, 1986, at 20.

Relying solely on one of these articles, the Banks state that Knutson acted on Home Owners' behalf as a servicer, whose role was "to collect the mortgage payments, . . . escrow funds for insurance and real estate taxes, and otherwise monitor borrowers' accounts."  The Banks also state, as noted at the outset, that "Knutson possessed limited powers and rights on [the Washingtons'] note and mortgage.  Presumably, pursuant to a servicing agreement between Home Owners and Knutson, these powers and rights did not include the power of assignment."  This statement is unsupported by anything in the record, including the news articles, and, indeed, is unaccompanied by any citation.[2]

In any event, Knutson later executed an assignment of both the note and mortgage to ASIP.  Like the earlier assignments of the note, this assignment was executed by indorsing it, on behalf of Knutson, "pay to the order of American Strategic Income

---

[2]Instead, the Banks assert that "[s]uch a scheme has become commonplace, because it allows the pooling, packaging, marketing, and rapid transfer of real property debt to be carried out without the administrative burden of re-assigning the real property interest with every transaction."  While that is undoubtedly true, it does not follow that this sort of arrangement (i.e., transferring the servicing rights to a mortgage loan without transferring the loan itself) was "commonplace" some 25 years ago, when the Home Owners-Knutson assignment occurred.  Moreover, even if the fact that such an arrangement were "commonplace" in 1987 could be established by competent evidence (as opposed to an assertion in a brief as to what is "commonplace" now), that would not create a genuine issue as to whether the Washingtons' note was assigned to Knutson pursuant to such an arrangement.  See infra Part III.

Portfolio Inc.-III without recourse."  Knutson also executed an "assignment of mortgage" to AMSI, dated March 26, 1993, which was recorded in the Rockingham County Registry of Deeds on February 18, 1994.  There is no record evidence that AMSI subsequently assigned either the note or the mortgage to anyone else.

In the meantime, the parties agree, the federal government seized control of Home Owners in 1990, placing both it and Knutson, its subsidiary, into the receivership of the Resolution Trust Corporation ("RTC").  The parties further agree that RTC sold Knutson to a private buyer in 1992.  The only record evidence of these facts consists of news articles submitted by the government.  See Tony Cariedo, Two big business deals: one's in health care, the other in mortgage banking, Minneapolis-St. Paul Star Tribune, Nov. 3, 1992, at 2D; Phil Roosevelt, Many vie to buy mortgage servicer, Am. Banker, Feb. 7, 1992, at 6.

The parties also agree that, on September 1, 1995, RTC, acting as receiver for Home Owners, executed an assignment of the Washingtons' note and mortgage to First National.  This was accomplished by way of an allonge referring to the note and stating "pay to the order of" First National "without recourse," and an "assignment of mortgage" instrument reciting a date of September 1, 1995, bearing signatures dated October 10, 1995, and recorded with the Registry of Deeds on April 16, 1996.  A

"satisfaction of mortgage" was later recorded in the Registry, on September 21, 2005. This instrument stated that the Federal Deposit Insurance Corporation, which "succeeded the [RTC] as receiver" for Home Owners, "acknowledge[d] satisfaction" of the Washington's note and mortgage.

Nevertheless, the Banks maintain, by way of an affidavit from a Bank of America employee, that "[t]he loan has not been paid in full, nor has the mortgage securing the note been discharged of record in the registry." In fact, the employee states, the Washingtons owed more than $132,000 on the loan as of late August 2012. The employee further states that, since November 13, 2006, Bank of America has "service[d] the loan of the Washingtons for Bank of New York Mellon" and that "[b]ased upon the business records of Bank of America, N.A., the original note came into the possession of Bank of America, N.A., on or before November 16, 2009."

But, in their answers to the government's interrogatories in this action, see Fed. R. Civ. P. 33, the Banks have acknowledged that the note "subsequently was lost." A Bank of America vice president, in fact, executed an "affidavit of lost note" to that effect, dated December 23, 2011. The Banks also stated in their interrogatory responses that Bank of America "is in the process of obtaining an assignment from the last mortgage holder of

8

record, The First National Bank of Chicago."  At oral argument,
however, the Banks acknowledged that they have yet to obtain such
an assignment.

**B.   Procedural history**

The government claims that the Washingtons owe more than
$329,000 in income taxes, penalties, and interest, dating back to
1998.  In both April 2002 and March 2009, the government filed a
notice of federal tax lien against the Washingtons' property for
their alleged liabilities for the tax years encompassing, first,
1998-2000, and, then, 2001-2007.  In February 2010, the
government commenced this action against the Washingtons, seeking
to collect these alleged liabilities.  See 26 U.S.C. § 7403(a).
The government then filed an amended complaint seeking to
foreclose on its liens against the Washingtons' property and
naming, as additional defendants, AMSI and Bank of America.  See
id. § 7403(b).  The Clerk later defaulted both AMSI and Bank of
America for failing to answer or otherwise respond.  See Fed. R.
Civ. P. 55(a).

The case was then stayed, as to the Washingtons only, after
they sought bankruptcy protection in the Bankruptcy Court for the
District of New Hampshire.  In re Washington, No. 10-12227
(Bkrtcy. D.N.H. May 10, 2010).  The government then moved for
entry of default judgments in this action against both AMSI and

9

Bank of America, but this court subsequently granted Bank of America's motion to set aside the entry of default, see Fed. R. Civ. P. 55(c), which the government did not oppose.  Order of Aug. 17, 2010.  This court did, however, grant the government's motion for entry of a default judgment against AMSI, extinguishing any right, title, or interest it had in the Washingtons' property.  Order of Sept. 14, 2010.

In the meantime, the Bankruptcy Court discharged the Washingtons' debts, In re Washington, No. 10-12227 (Bkrtcy. D.N.H. Aug. 23, 2010), and closed the case, In re Washington, No. 10-12227 (Bkrtcy. D.N.H. Sept. 10, 2010).  Apprised of these developments, this court lifted the stay of this case against the Washingtons.  Order of Sept. 27, 2010.  The court then granted the government's motion, which was not opposed, to amend its complaint again.  Order of Feb. 10, 2011.  The government's second amended complaint added Bank of New York as a defendant. The amended complaint also added a claim against the Washingtons that their discharge in bankruptcy had not relieved them of their federal income tax liabilities because they had willfully evaded them.  See 11 U.S.C. § 523(a)(1)(C).  When the Washingtons moved to dismiss this claim as inadequately pled, see Fed. R. Civ. P. 12(b)(6), the government responded, in part, that it was "willing to put off litigating the dischargability issue until after the

10

[Washingtons'] property is sold so that the parties will know the extent of the remaining liability and will have an opportunity to consider a settlement at that time."

After this court ordered the parties to confer as to this proposal, Order of Mar. 28, 2011, the Washingtons indicated their assent to it, resulting in another stay of this action, this time so that the Washingtons could attempt to sell the property. Order of Mar. 12, 2011.  The parties later entered a stipulation for the sale of the property, at a price to be approved by both the government and the Banks, with the proceeds to be deposited into court and distributed according to the parties' relative priorities.  Nearly a year later, after the Washingtons had received an offer on the property, the court entered a proposed consent decree allowing the sale to proceed according to the stipulation.  Order of Dec. 10, 2012.  The sale took place, and the net proceeds ($185,380.08, after payment of the broker's fee and real estate taxes) have been deposited with this court.

In the meantime, the court lifted the stay as to the government's claim against the Banks, Order of June 1, 2012, and the government moved for summary judgment.  The Banks filed an objection, to which both the government and the Washingtons filed a reply.  The court then heard oral argument on the motion.

III. **<u>Analysis</u>**

A federal tax lien "shall not be valid as against any . . .
holder of a security interest" in the property, 26 U.S.C.
§ 6323(a), provided, in relevant part, "the interest has become
protected under local law against a subsequent judgment lien
arising out of an unsecured obligation," id. § 6323(h)(1)(A).
Under this statute, "'security interest' means any interest in
property acquired by contract for the purpose of securing payment
or performance of an obligation," id. § 6323(h)(1), such as, in
this case, a mortgage.

In moving for summary judgment, the government argues that
there is no genuine issue of material fact as to whether the
Banks are the "holder of a security interest" in the Washingtons'
property at the time it was sold, so that this court should
decree that the Banks have no claim to the proceeds of the sale.
In their answers to the government's interrogatories, the Banks
identify the sole basis of their interest in the property as the
mortgage that the Washingtons gave Camelot.  The Banks explain
that "[t]he note received [*sic*] by the mortgage has been assigned
to [Bank of America].  Under New Hampshire common law the
mortgage follows the note.  Since [Bank of America] is the holder
of the note it is the holder of the mortgage."

As already discussed, though, the Banks have admitted that, as of December 2011 at the latest, they no longer had possession of the Washingtons' note.  That means that neither of the Banks is in fact the "holder" of the note under New Hampshire's version of the Uniform Commercial Code, which defines "holder" in relevant part as "the person in possession of a negotiable instrument."[3] N.H. Rev. Stat. Ann. § 382-A:1-201(b)(21)(A).  As the government points out, "[a] person not in possession of [an] instrument is entitled to enforce the instrument," but only if, among other things, he "was entitled to enforce the instrument when the loss of possession  occurred." N.H. Rev. Stat. Ann. § 382-A:3-309(a).  Furthermore, "[a] person seeking enforcement of an instrument under [§ 382-A:3-309(a)] must prove . . . the person's right to enforce the instrument." Id. § 382-A:3-309(b).

The government argues that the Banks have failed to show a genuine issue of material fact as to whether they had the right to enforce the Washingtons' note at the time the Banks say they lost possession of it.  As noted at the outset, the Banks claim to have received an assignment of the note from First National, which is identified as the transferee of the note on the allonge

---

[3]The parties agree that state law, specifically, that of New Hampshire, governs the question of the Banks' interest in the Washingtons' property (now, its proceeds).  See United States v. Lebanon Woolen Mills Corp., 241 F. Supp. 393, 395 (D.N.H. 1964).

executed by RTC as the receiver for Home Owners and dated September 1, 1995.  See Part II.A, supra.  Before that date, however, Home Owners had already transferred the note to Knutson (on October 27, 1987), which then, in turn, transferred the note, and assigned the mortgage, to ASIP (on March 26, 1993).  See id. New Hampshire follows the rule that, as between successive assignments, the first in time is first in right.  See Am. Emp'rs Ins. Co. v. Sch. Dist., 99 N.H. 188, 192 (1954); see also, e.g., 6A C.J.S. 2d Assignments § 98, at 490-91 (2004).  Because Home Owners, in 1987, "had divested itself of its rights by the assignment to" Knutson, Home Owners "had nothing to assign to" First National in 1995.  Am. Emp'rs Ins. Co., 99 N.H. at 192.

The Banks do not question that this is the law, nor do they claim to have received an assignment from ASIP or its successors in interest (if any; again, there is no record evidence that ASIP assigned either the note or the mortgage to anyone, and the Banks admit that they have not received any assignment of the mortgage from ASIP).  Instead, as discussed supra, the Banks say that, "[i]n fact, Knutson possessed limited powers and rights on the note and mortgage," which "did not include the power of sale or assignment."  While the Banks do not fully explain the significance of this point, the court takes it to mean that, in the transfer of the note to Knutson from Home Owners, Knutson did

not obtain the right to transfer the note further, thus voiding Knutson's subsequent transfer of the note, and assignment of the mortgage, to ASIP.  But there is no record support for the asserted "fact" that Knutson's rights in the note did not include the right of transfer.

Under New Hampshire's version of the Uniform Commercial Code, "[t]ransfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course."  N.H. Rev. Stat. Ann. § 382-A:3-203(b).  Here, Home Owners transferred the note to Knutson by way of negotiation, indorsing the note "pay to the order of" Knutson.  See id. § 382-A:3-201.  This vested in Knutson all the rights that Home Owners enjoyed as holder of the note, including the right to transfer it.  In New Hampshire, as elsewhere, "an assignee obtains the rights of the assignor at the time of the assignment."  YYY Corp. v. Gazda, 145 N.H. 53, 61 (2000) (applying this rule to the transfer of a promissory note); see also, e.g., 5A Ronald A. Anderson, Anderson on the Uniform Commercial Code § 3-201:16, at 454 (3d ed. 1994) ("Commercial

15

paper may be assigned in which case the assignee stands in the same position as the assignor.").[4]

It is true, of course, that a transferor may transfer less than all of its rights in an instrument. See N.H. Rev. Stat. Ann. § 382-A:3-203(d). Again, though, on the face of the note, Home Owners transferred all of its rights to Knutson by indorsing it over to Knutson, and the Banks have offered nothing but speculation to support their theory that a servicing agreement between Home Owners and Knutson nevertheless restricted Knutson's rights in the note. See note 2 and accompanying text, supra.

As an initial matter, there is no competent evidence of a servicing relationship between those entities, only news articles, which are hearsay, see Fed. R. Evid. 801, that cannot be considered on summary judgment, see, e.g., Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011). Even putting that aside, however, the mere fact that Knutson acted as a servicer for mortgage loans held by Home Owners does not create a genuine issue as to whether, in endorsing the Washingtons' note to

---

[4]While "[a]n assignment is a transfer . . . [t]he transfer of rights in commercial paper by assignment, as distinguished from negotiation, is not regulated by the Code," but by "pre-Code law." 5A Anderson, supra, § 3-201:13, at 452-53 (footnotes omitted). But that distinction is unimportant here because all transfers of the note were accomplished by negotiation. Thus, the court uses the terms "assignment" and "transfer" interchangably in referring to the note.

16

Knutson, Home Owners was reserving for itself the right to make
further transfers of the note.  Unsupported speculation--or, as
the Banks themselves call their theory, "presum[ption]"--does not
create a genuine issue of material fact capable of defeating
summary judgment.  See Part I, supra.

       In a similar vein, the Banks state that, "[g]iven the
evidence [the government] has itself presented, it is entirely
possible that Knutson never owned the mortgage."  While the
government has not come forward with an instrument assigning the
Washingtons' mortgage from Home Owners to Knutson, it is
undisputed, as just discussed, that Home Owners transferred the
underlying note from Home Owners to Knutson.  Under New Hampshire
law, as the Banks acknowledge, "a transfer of the debt, ipso
facto, transfers the mortgage," so that a separate assignment of
the mortgage "by deed or writing is not necessary."[5]  Whittemore
v. Gibbs, 24 N.H. 484, 487 (1852).  So, just as the Banks have
failed to show a genuine issue of fact as to whether Home Owners
transferred its rights in the note to Knutson, they have also

---

       [5]As a recent decision by the New Hampshire Superior Court
explains, "the intention of the parties to the transaction can
override the common law principle that the debt and mortgage are
inseparable."  Dow v. Bank of N.Y. Mellon Trust Co., No. 218-
2011-CV-1297, slip op. at 14-16 (N.H. Super. Ct. Feb. 7, 2012)
(Delker, J.).  Here, however, there is nothing in either the note
or the mortgage instrument suggesting such an intention.  Indeed,
the Banks themselves claim their interest in the mortgage solely
through their alleged interest in the note.

failed to show a genuine issue of fact as to whether Home Owners transferred its rights in the <u>mortgage</u> to Knutson.

In their objection to the summary judgment motion, the Banks advance three other arguments.  First, they say that the government has adduced no competent evidence on "RTC's sale of Knutson," even though its theory that First National (and hence the Banks) held no interest in the Washingtons' note depends on the premise that "RTC, and then Knutson, had previously transferred the Washingtons' mortgage to ASIP."  But the government's position--and, for that matter, the undisputed evidence--is not that <u>RTC</u> assigned the note or mortgage to ASIP. It is that <u>Knutson</u> assigned the note and mortgage to ASIP.  While the news articles report, and the parties agree, that Knutson was already in receivership by that point, the Banks do not seem to be arguing that this fact has any effect on the validity of the assignment from Knutson to ASIP.  Moreover, even if it did, that would not change the fact that, well before the receivership, Home Owners had transferred the note to Knutson--a transfer that itself predates, and voids, RTC's later transfer of the note (on behalf of Home Owners) to First National.  So the Banks are incorrect that "the fact of what exactly RTC sold when it sold Knutson is necessarily material."

18

Second, the Banks argue that this court did not discharge the mortgage encumbering the Washingtons' property by entering a default judgment against ASIP.  Even if that is correct, it is irrelevant to whether summary judgment should enter against the Banks on their claim to a mortgage interest in the property (or the proceeds of its sale).  As discussed more than once already, the Banks do not claim any interest through ASIP.  To the contrary, the Banks say that ASIP never held any interest in the Washingtons' mortgage in the first place because Knutson, ASIP's transferee, lacked the power to make that transfer.  So the status of ASIP's interest in the Washingtons' property is immaterial to the Banks' claim to an interest in that property and, therefore, to the government's motion for summary judgment on that claim.[6]

Third, the Banks argue that the government "lacks standing" to challenge the validity of the assignment from RTC, as the Home Owners receiver, to First National.  The government, however, has

---

[6]All that said, this court's default judgment against ASIP, on its face, "extinguished" all of ASIP's "rights, titles, claims, liens, and interests" in the Washingtons' property. Order of Sept. 14, 2010.  The Banks are simply wrong to say that this court lacked the power to enter such a judgment.  See 26 U.S.C. § 7403(c) (directing this court, "after all the parties have been duly notified of [an] action" by the government to foreclose on tax liens, to "adjudicate the matters involved therein and finally determine the merits of all claims to and liens upon the property").

an interest in the Washingtons' property by virtue of its tax liens--an interest that would be diminished, if not eviscerated, if the Banks can enforce the competing interest in the property they claim through the Home Owners-First National assignment.

That gives the government "standing" to challenge that assignment, at least on the basis the government asserts, i.e., that Home Owners had previously assigned its interest in the Washingtons' note, and hence their mortgage, to Knutson.  See Drouin v. Am. Home Mtg. Servicing, Inc., 2012 DNH 089, 7-10 (recognizing mortgagors' standing to challenge an alleged assignment of their mortgage to a foreclosing defendant on the grounds that the assignor did not hold the mortgage at the time); accord Culhane v. Aurora Loan Servs. of Neb., 708 F.3d 282, 291 (1st Cir. 2013) (recognizing mortgagor's standing, as a matter of both Article III of the Constitution and Massachusetts law, "to challenge a mortgage assignment as invalid, ineffective, or void (if, say, the assignor had nothing to assign . . . )").

The Banks also argue that the government is attempting to "enforce" Knutson's assignment of the note and mortgage to ASIP, and that the government lacks standing to do that as well.  But the government does not derive its claimed interest in the Washingtons' property (or, now, the proceeds of its sale) from the Knutson-ASIP assignment.  As just noted, the governments'

claimed interest comes from its federal tax liens.  Relying on the Knutson-ASIP assignment to show that the subsequent Home Owners-First National assignment was void is not tantamount to trying to "enforce" the Knutson-ASIP assignment.  See Culhane, 708 F.3d at 290 (refusing to apply the rule that "a nonparty who does not benefit from a contract generally lacks standing to assert rights under that contract" to deny a mortgagor the "right to challenge a foreclosing entity's status qua mortgagee" by "challenging the validity of an assignment that purports to transfer the mortgage to a successor mortgagee").

## IV.  **Conclusion**

In short, the government has demonstrated, through the Washingtons' note and the endorsement transferring it from Home Owners to Knutson, that there is no genuine issue of fact as to whether the Banks have an interest in the Washingtons' property or the proceeds of its sale.  The Banks claim that interest solely through an entity, First National, that did not receive an assignment of Home Owners' interest in the Washingtons' note or mortgage until after Home Owners had assigned its interest in the note and the mortgage to someone else.  The Banks have failed to show any genuine issue of fact material to this chronology or the validity of Home Owners' initial assignment.  Accordingly, the government's motion for summary judgment on the Banks' claim to

an interest in the proceeds of the sale of the Washingtons'
property[7] is GRANTED.

**Remaining claim**

The only claim remaining in the case, then, is the
government's claim against the Washingtons, which is stayed at
the moment (as it has been for much of the pendency of this
litigation, see Part II.B, supra).  At oral argument, the
government represented that settlement with the Washingtons would
be greatly facilitated by the certainty ensuing from this court's
resolution of the summary judgment motion.  This court's entry of
a default judgment against ASIP, together with its entry of
summary judgment against the Banks, leave the government as the
exclusive claimant to those proceeds (which are considerably less
than the Washingtons' alleged federal tax liabilities at this
point).  The Banks, however, are entitled to appeal this court's
entry of summary judgment against them, which would reintroduce
the uncertainty as to the government's ability to recover from
the proceeds.

Under these circumstances, this court concludes that "there
is no just reason for delay" in directing the entry of final
judgment on the government's claim against the Banks, even though

_____

[7]Document no. 55.

22

final judgment cannot enter on the government's claim against the Washingtons.  <u>See</u> Fed. R. Civ. P. 54(b).  So far as this court can tell, there is no overlap between the factual and legal issues underlying those two claims.  If the Banks elect to appeal the judgment against them, proceedings on the appeal can occur simultaneously with proceedings in this court on the government's claim against the Washingtons (should the government decide to proceed on that claim rather than settle it in light of the possibility that the appeal would succeed, potentially reducing the government's share of the proceeds).

That process strikes the court as considerably more efficient, and just, than forcing the government and the Washingtons to resolve their dispute, either through litigation or settlement, before knowing whether or not the Banks will appeal the entry of summary judgment against them (which, in that scenario, they would not have to decide until after the resolution of the government's claim against the Washingtons enables this court to enter final judgment on all claims).  These concerns are particularly important here, where continued litigation between the government and the Banks would consume, on one side, the resources of the public, and, on the other side, the resources of debtors who have just recently emerged from a no-asset bankruptcy.  Finally, as already noted, the government's

claim against the Washingtons has been stayed for nearly the entirety of the pendency of this action; the parties have not conducted discovery.  So forcing them to resolve that claim even though (if the Banks do not appeal) they may very well choose not to do would result in substantial, and potentially unnecessary, expense to both the government and the Washingtons.

Accordingly, the clerk shall enter final judgment on the government's claim against the Banks.  The government's claim against the Washingtons shall remained stayed until the earlier of (1) the Banks' filing of a notice of appeal or (2) the expiration of their time for doing so.  Within 45 days of the earlier of those two events, the government and the Washingtons shall file a joint report informing the court of the status of their settlement negotiations, if any (including an estimate of how much longer they expect the negotiations to continue) or seeking the lifting of the stay so that litigation of the claim can resume.  If the parties cannot agree on a course of action, they shall schedule a telephone conference with the court.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 28, 2013

24

```
cc:  Edward J. Murphy, Esq.
     Patricia E.S. Gardner, Esq.
     William Philpot, Jr., Esq.
```